UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


NATHAN HICE ) Case no. 1:15 cv 534
)
    Plaintiff )
)
Vs )    Judge Beckwith
)
THE DAVID J. JOSEPH CO. )    Magistrate Judge Bowman
)
    Defendant )


**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page no.

**FACTUAL BACKGROUND**.…………………………………………………………………………………3

**LAW AND ARGUMENT**……………………………………………………………………………10

    **I.**    **Plaintiff's Family Medical Leave Act Claim was a "Permissive Counterclaim" Dismissed Pursuant to Ohio Civil Rule 41(A) and Plaintiff is not Barred from Reasserting the Instant Action.** ……………………………………………………………10

    **II.**    **Plaintiff has Presented a Prima Facie Case of a Family Medical Leave Act Violation. There are Genuine Issues of Fact Regarding Whether the Defendant Complied with it Duties Under the Law**……………………………………………….....................................16

        A.  Defendant is an Employer and Plaintiff is an Eligible Employee under the FMLA……………………………………………………………………………..18
        B.  Plaintiff suffers from a Serious Health Condition……………………………18
        C.  Plaintiff's need for FMLA was Unforeseeable. Plaintiff's Behavior on August 23, 2013 and August 26, 2013 was so Unusual that it Gave Defendant Notice of his Need for FMLA Leave. Defendant Failed to Provide Plaintiff with a Vacation Day for August 23, 2013……………………………………………………20

    **III.**    **There are Material Questions of Fact Regarding Whether Plaintiff's Work Performance was Satisfactory, and Thus Whether Defendant's Allegations of Unsatisfactory Performance are a Legitimate Reason for His Termination**……...23

    **IV.**    **Ohio has a Clear Public Policy Against Stalking and the Issuance of Protective Orders Against Stalkers. There are Material Questions of Fact Regarding Whether Plaintiff was Terminated for Seeking a Protective Order Against his Supervisor's Sister-in-Law**……………………………………………………………………….25

**CONCLUSION**……………………………………………………………………………27

**CERTIFICATE OF SERVICE**…………………………………………………………………28

NOW COMES PLAINTIFF, and for his Response in Opposition to Defendant's Motion for Summary Judgment, states as follows.

## FACTUAL BACKGROUND

Plaintiff, age 38, graduated from the University of Cincinnati with a bachelor's degree of Science in Education. In or about 2004, Plaintiff was diagnosed as suffering from C

hronic Anxiety Disorder, Depression and Insomnia.  Exhibit 1. Plaintiff received hospital emergency room treatment twice for his condition. His condition requires continuous treatment under the supervision of a health care provider. At various times, he has been prescribed Adderall, Clonazepam, Seroquel, Trazodone and other drugs to control the conditions. Exhibit 1. He often had difficulty waking up in the mornings due to the medications. Hice depo. 186.

In 2006 he was employed by the Defendant in the position of Ferrous Brokerage Representative. His work performance was above-satisfactory.  In August 2011, he voluntarily resigned.

Plaintiff was rehired by the Defendant on September 26, 2011, in the position of Nonferous Brokerage Representative (a "trader".) He reported to Terry Rath in the Metals Group in Cincinnati, Ohio. Mr. Mark Bonner was his direct supervisor. His job duties consisted of managing a territory of over 15 states and three Canadian provinces, buying and selling metal and marketing metal generated by Defendant's metal recovery facilities to outside consumers. Plaintiff's work-performance was above-average and he received above-satisfactory

evaluations, raises and bonuses every year. Plaintiff was a hard worker and was never written-up. Fischer depo. 22; Hice depo. 321.

The Defendant does not have a specific discipline policy. Luther depo. 10. Rather, it "coaches" employees through conversations, which are sometimes documented. Luther depo. 10-11. The traders do not have set times in the office. Fischer depo. 11. In 2013, the margins were expected to be smaller or tighter because of what was going on in the industry. Fischer depo 22. Some traders liked to work on volume. Fischer depo. 23. Plaintiff was one. Fischer depo. 23.

The Defendant has various leave polices: those include a Domestic Violence Leave and the Family Medical Leave Act. Luther depo. Exhibits 9 & 15. It also provides employees the ability to use Flex Time Work Schedules and paid vacations. Luther depo. Exhibits 13 & 16.  Both the Domestic Violence Policy and the FMLA policy provide that when leave is unforeseeable, the employee should notify his manager and Human Resources as soon as feasible. Luther depo. Exhibits 9 & 15. The Domestic Violence Policy also requires that paid time off may be used. Luther depo. Exhibit 9.

On February 13, 2013, Plaintiff was driving from St. Louis, Missouri back to Cincinnati, Ohio. While driving back, Karen Luther , in H.R., contacted him via email at 2:00 p.m. She asked if he was ok. Group Exhibit 2. At 3:00 p.m. Plaintiff pulled off the road to take a break and saw her email. He responded that he was fine and was driving back from St. Louis. Group Exhibit 2. Plaintiff worked during the day. Group Exhibit 2.

In or about February 2013, Plaintiff met Sarah Jahnke.  Her sister Kate Rath is married to Plaintiff's supervisor, Terry Rath. Plaintiff began dating Ms. Jahnke.

On June 20, 2013, the Defendant scheduled a photo shoot and asked the Plaintiff to participate. Early that morning Plaintiff telephoned Mark Bonner and told him that he had an emergency and that he would work from home that day. Exhibit 3. As he often did, Plaintiff worked from home; and he emailed Bonner throughout the day to keep him updated on his work. Group Exhibit 4. Later that day Karen Luther contacted Plaintiff. During this conversation, she told him that Mark did not tell her that Plaintiff would not be in that day. Group Exhibit 4.

Defendant was aware of Plaintiff's medical condition. On June 28, 2013, Plaintiff discussed his anxiety and how it kept him from sleeping with Mr. Bonner. Exhibit 5. He acknowledged that he knew Plaintiff could not sleep and often worked during the early morning hours. Exhibit 5. Since every employee has access to the emails chains and saw this email, Plaintiff complained to Bonner about discussing his medical condition on the email chain. Hice depo. 170-71. Bonner knew whether employees were working because every purchase and sale goes through the Defendant's email system and every employee and supervisor have immediate access to those emails. Bonner depo. 90.

In or about July 2013, Plaintiff wanted to end the relationship with Ms. Jahnke and began distancing himself from her. But, she wanted to continue the relationship and would go to Plaintiff's home unannounced and unwelcome. Plaintiff told her that the relationship was over, but she was unwilling to accept this. The situation escalated until Plaintiff was forced to call the police. By the time the police arrived Ms. Jahnke had left. The police officer called her and told her to never come back to Plaintiff's home or call him again.

Despite being warned, Ms. Jahnke continued to contact the Plaintiff alleging that he had taken a dog cage. On August 10, 2013, Plaintiff went to Cincinnati Police District 2 with his

father, James Hice. They were instructed to follow a police officer to her house. There the Plaintiff gave her a new dog cage. While they were at Ms. Jahnke's house Plaintiff's supervisor Terry Rath and his wife, Kate Rath who is Ms. Jahnke's sister, arrived. They witnessed the police officer tell Ms. Jahnke to have absolutely no contact with the Plaintiff. Plaintiff then explained the situation to Mr. Rath, and told him that it was really affecting him. Hice depo. 231. Rath then told Plaintiff missed out on a promotion because he missed days. Hice depo. 289.

Despite Rath and Bonner being told that this situation was affecting Plaintiff mentally and his ability to work and observing the police intervention they did nothing: they did not contact HR, forward FMLA paperwork to the Plaintiff or permit him to take vacation days.

Ms. Jahnke subsequently sent voluminous text messages to Plaintiff on his company cell phone. Some of those messages were threatening. She continued to come to his house several times during the evenings, knocking and screaming relentlessly at his door for hours. Plaintiff recorded a video of this behavior on his company telephone. As a result, Plaintiff's Depression, Chronic Anxiety Disorder and Insomnia were exacerbated. He had difficulty sleeping and became extremely nervous and agitated. Exhibit 1. Plaintiff was diagnosed as suffering from Post-traumatic Stress Disorder. Exhibit 1, pg. 6.

Plaintiff contacted Mr. Bonner and explained what was going on and that he may miss work because of the situation exacerbating his medical condition. HIce depo. 281-84, 303, 306-06, 312-13, 323.

On Thursday August 22, 2013, Plaintiff received several telephone calls and text from unknown numbers during the night regarding Ms. Jahnke. Some of the text and calls warned

him of what she may do to him.  Hice depo. 297, 301. He became extremely distraught, became concerned for his safety and was unable to sleep. Hice depo. 282-84.

Plaintiff was so concerned for his safety that at around 12:00 a.m. on August 23rd, he telephoned LifeWorks, an EAP helpline provided by the Defendant for its employees.  Hice depo. 296, 302. Plaintiff spoke with a representation for about one hour. The representative advised him to get out of his house and go to a safe place, draft a note to your boss about it being urgent and since Mr. Bonner and Mr. Rath had already proved to be of no help, go directly to Human Resources on Monday August 26th and make them aware of everything going on. HIce depo. 296-97. Plaintiff was instructed by LifeWorks to not give details of Ms. Jahnke threatening him, but to describe the situation as urgent and pressing; and to tell Mr. Bonner that he would be in contact later and that he would not be able to do his job duties to his fullest abilities and to request a vacation day or a day off with no pay and state that he would work from home. Hice depo. 296-97.

Because Plaintiff was in such fear for his safety at 3:00 a.m. he drove two hours to his parents' home.  His anxiety disorder was exacerbated to the point where he could not focus, think clearly or sleep. Exhibit 1. After not sleeping all night, he began to receive work related emails. Group Exhibit 7. He responded with simple answers and only worked on those that did not require focus or consideration due to his mental health condition. Group Exhibit 7.   On that day, he contacted the following accounts: Joe Apkin, Natassja, George Eten, Eric Rolf, Metal Green Recycling, Michael Gilligan, Harding Metals, Inc., John Catalano, Keith Schultz, Deanna Montgomery. Group Exhibit 7.  Bonner did not check emails to see if Plaintiff worked on the 23rd. Bonner depo. 89. Plaintiff was never told that his customers complained about him.

On Friday August 23, 2013, Plaintiff followed LifeWorks representative's instructions and emailed Mark Bonner stating that he would not be in and requested a vacation day. Hice depo. 295-96; Exhibit 8

Later on the 23rd Plaintiff returned home. That day Casey Fischer, a co-worker, told Bonner that he was going to stop by Plaintiff's house because he was worried that had not responded to emails. Fischer depo. 16. Bonner said to do whatever he wanted. Fischer depo. 16. Fischer arrived at Plaintiff's house and knocked on the door to check on him. Plaintiff answered the door and told him that he should not be here and that he should get out of there. Fischer depo. 18. Fischer asked if everything was ok; Plaintiff looked nervous and responded that something was about to go down. Fischer depo. 18-19. Fischer became nervous and did not know if he was ok. Fischer depo. 18. Plaintiff then shut the door and he left. Fischer knew something was wrong and that "something was off." Fischer depo. 19. As Fischer was leaving, he telephoned Bonner and told him that he had just been to Plaintiff's house and that something was wrong with him, that something seemed off. Fischer depo. 20. Bonner responded that he didn't have to go there. Fischer depo. 20. Fischer was still concerned. Bonner did nothing to help Plaintiff.

Later that day, Plaintiff contacted the Cincinnati Police Department and explained the situation. The officer he spoke with advised him to get a restraining order against Ms. Jahnke.

On Sunday August 25, 2013, Plaintiff emailed Karen Luther, in Defendant's Human Resources Department. In the email, Plaintiff stated that he needed to speak with her on Monday morning. Exhibit 9.

On Monday August 26, 2013, Plaintiff met with Ms. Luther. During this meeting Plaintiff discussed his concerns regarding Ms. Jahnke, his concerns for his safety both at home and at

work because she worked and lived close to him, particularly due to the threats from Ms. Jahnke and the messages from unknown numbers saying that something was going to happen to him. He also told them that he was extremely agitated, anxious and had lost sleep and that this was why he missed work on the 23rd.  Exhibit 1; Luther depo. 31. Ms. Luther then contacted Mr. Bonner who met them in her office.  Luther depo. 31-32. They discussed leave in general, but neither Luther or Bonner specifically informed Plaintiff about his rights under the FMLA or looked into it further.  Luther depo. 86-87. Plaintiff then returned to his desk and worked the remainder of the day.

On Tuesday August 27, 2013, when Plaintiff arrived at work, he was instructed by Mr. Bonner to go to a conference room. There Plaintiff met with Mr. Rath, Ms. Luther and Mr. Bonner.  Mr. Rath told Plaintiff that he wanted to know everything that happened after August 10, 2013 with Ms. Jahnke. Hice depo. 368-70.  Plaintiff repeated the events to all three. Mr. Rath insisted that he hear the voicemails after August 10th and wanted to know what number she was calling him from and to see the number as it appeared on the voicemails. Plaintiff played all three voice mails.  At this point, the tone of the meeting changed, and Mr. Rath told Plaintiff that if he got a restraining order against her he could be arrested if he spoke with her, and he asked him not to send the restraining order to her place of employment. Plaintiff then returned to work.

Later that day, at approximately 3:30 p.m. Mr. Bonner took Plaintiff to the main conference room. Ms. Luther was waiting for them. They told Plaintiff that it was company policy to report an incident to the executive board and that he was being terminated. They demanded that he return the company vehicle and cell phone and told him there was a cab waiting for him

outside. They accompanied him to the company car in the garage and watched as he took his belongings from the car. He told them that he needed the phone for the protective order hearing that next day. Despite this, they took the phone and escorted him out of the building.

On August 30, 2013, a temporary restraining order was issued in favor of Plaintiff and against Ms. Jahnke. On September 16, 2013, a five year protective order was issued in favor of Plaintiff and against Ms. Jahnke.

## LAW AND ARGUMENT

I.  **Plaintiff's Family Medical Leave Act Claim was a "Permissive Counterclaim" Dismissed Pursuant to Ohio Civil Rule 41(A) and Plaintiff is not Barred from Reasserting the Instant Action.**

Defendant argues that Plaintiff's Family Medical Leave Act ["FMLA"] claim was a compulsory counterclaim that must be dismissed because it was not pursued in state court. Motion at 7. Defendant's argument fails because the claims for violation of the FMLA and state wrongful discharge which involve mental health and work performance do not rise out of the same transaction or occurrence as its counterclaim seeking reimbursement for credit card charges and return of an Ipad and cell phone. Moreover, the facts supporting the FMLA claim arose during Karen Luther's deposition on December 4, 2014.

Plaintiff filed a claim in the Hamilton County Court of Common Pleas alleging wrongful discharge under state law. In response, Defendant filed a counterclaim seeking reimbursement for unpaid charges on Plaintiff's company credit card and return of a cell phone and Ipad. Motion at Exhibit B. Plaintiff did not dispute that he owed personal charges on the card and that the equipment belonged to the Defendant. Hice depo. 393.

During discovery facts were discovered that establish a violation of the FMLA. Karen Luther, head of HR, testified that she did not specifically notify Plaintiff of his right to FMLA leave or investigate his need for leave after he missed work on Friday August 23, 2013 although she was aware of his anxiety over and fear of Ms. Jahnke. Luther depo. 31. Defendant filed a motion for summary judgment on Plaintiff's claims and its counterclaim. Pursuant to Ohio Civ. R. 41(A) the Plaintiff then dismissed, without prejudice, the wrongful discharge claim. Defendant proceeded with its counterclaim regarding the payment and return of company property. The state court granted judgment for Defendant on the counterclaim. Plaintiff then filed the instant action in this Court alleging violations of the FMLA and state wrongful discharge.

Under Ohio Civil Rule 13(A) a claim is compulsory if it arises out of the same transaction or occurrence; that is that they "involve many of the same factual issues, or the same factual and legal issues, or are offshoots of the same basic controversy between the parties." *Rettig Enterprises, Inc. v. Koehler,* 68 Ohio St.3d 274, 277 (1994).

By contrast, a permissive counterclaim need not be asserted. Ohio Civ. R. 13(B) provides:

> Permissive counterclaims. A pleading may state as a counterclaim any counterclaim against an opposing party not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.

> Restatement (Second) of Judgments sec. 22(2) (1982) states:

> A defendant who may interpose a claims as a counterclaim in an action but fails to do so is precluded, after the rendition of the judgment in that action, from maintaining an action on the claim if:

> (a) The counterclaim is required to be interposed by a compulsory counterclaim statute or rule or court; or

(b) The relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action.

See also, Moore's Federal Practice, sec. 131.21[3][c][i](3d ed. 2012)(a claim in a second action that would have been a permissive counterclaim in a prior action is not barred by claim preclusion if the adjudication of that claim would not nullify the initial judgment and would not impair rights established by the prior judgment); see *Mercoid Corp. v. Mid-Continent Inv. Co.,* 320 U.S. 661, 671, 64 S.Ct. 268(1994)(the fact that a claim might have been asserted as a counterclaim in the prior suit by reason of rule 13(b) does not mean that the failure to do so renders the prior judgment res judicata as respects it.) Because it need not be asserted in the underlying litigation, voluntary dismissal of a permissive counterclaim pursuant to Civ.R. 41(A) does not result in the party being barred from reasserting the claim.

Ohio courts have narrowly construed "transaction or occurrence" to mean that before a claim becomes compulsory more than mere connection to location and time are needed. A compulsory claim is one that is logically related to opposing party's claims where separate trials would involve duplication of effort and time. *Rettig Enterprises, Inc. v. Koehler,* 68 Ohio St.3d 274 (1994). Unlike the case at bar, many cases holding that the claim was compulsory involve a close connection with the claims, such as contracts or settlement agreements. *Rettig Enterprises, Inc. v. Koehler,* 68 Ohio St.3d 274 (1994) supports Plaintiff position that the employment claims are permissive because the facts and issues in the claims are different. There the Court held that a claim was compulsory because the facts

and issues were identical: both *Rettig II* and *Rettig III* involved the enforcement of the settlement agreement reached in *Rettig I. Rettig II* involved allegations by plaintiff that the defendants willfully and maliciously failed to pay sums as agreed in the settlement agreement reached in *Rettig I* regarding sale of Ohio Tool & Surplus. The defendants filed a counterclaim alleging that the plaintiff owed defendant money for items purchased while they operated Ohio Tool as outlined in the settlement agreement. The plaintiff dismissed the complaint pursuant to CR 41(A) and the court issued judgment in favor of the defendants on the counterclaim. The plaintiff subsequently filed *Rettig III* alleging that Defendants did not comply with the settlement agreement. The trial court dismissed the complaint reasoning that the claims were based on issues relating to the original settlement agreement. The appellate court reversed. The Ohio Supreme Court reinstated the trial court's dismissal of the suit. The Court reasoned that the claim was compulsory because it involved obligations and liabilities that arose during the sale of the business and the subsequent settlement agreement, thus involving many of the same factual and legal issues. *Id.*

In further support of Plaintiff's position, in *Ketter v. Burin,* Case no. 81 C/A. 46, 82-WL-3334, 7th District (April 8, 1982) the plaintiff was authorized to transfer money from defendant's accounts to a third party. Plaintiff's suit alleged that defendant owed plaintiff for money he loaned to defendant. Also, Plaintiff transferred more money than he was authorized. The court held that even though all transactions occurred during the same time period, the transactions of the subject counterclaim constituted a separate, independent cause of action than the transactions of plaintiff's complaint.

In a case striking similar to the one at bar, the Tenth Circuit Court of Appeals held that the state court claim of defendant was not a compulsory counterclaim; and therefore did not require dismissal of the plaintiff's federal claim. In *Valley View Angus Ranch, Inc. v. Duke Energy Field Services, Inc.,* 497 F.3d 1096 (10th Cir. 2007) Duke owned an easement through Valley View's property. Valley View observed a gas leak on the easement and notified Duke. Valley View refused to allow Duke on the property. Duke filed a state claim against Valley View in order to obtain access to its easement to install monitoring wells on its easement. Duke obtained a restraining order preventing Valley View from interfering with the project. The next day, Valley View filed a claim in U.S. District Court seeking damages for the gas leak under the theories of trespass, nuisance an unjust enrichment. Duke moved to dismiss the claim arguing that the claim was a compulsory counterclaim and should have been brought in the state court action. Under Oklahoma's compulsory counterclaim statute, like Ohio's Civ.R. (13)(A), the claim must be brought in the original action if it "arises out of the same transactions and occurrence" as Duke's breach of easement claim. The court held that the claims did not arise out of the same transaction or occurrence: Valley View's claims focused on the cause and extent of the leak and whether the alleged pollution was a nuisance and trespass, whereas the development of law and fact on Duke's claim would focus on the existence of an easement and how Duke was denied access. *Id.* Importantly, the court found that the only logical connection between the parties' claims is that they concern events occurring at the same place, but at different times, and reasoned that this nexus is too attenuated to meet the requirements of a compulsory counterclaim. *Id.*

A case from Colorado sheds more light on the logical relationship test.  In *Top Rail Ranch Estates v. Ronald E. Walker,* 327 P.2d 321 (Colo. App. 2014) the court held that the second claim was not compulsory. Colorado's compulsory counterclaim rule, like Ohio's, requires a defendant to plead as a counterclaim any claims that arises out of the transaction or occurrence that is the subject of the opposing party's claim. The Colorado court reasoned that the claim was not compulsory because the claims in the first action involved the parties' real estate sale agreement, while the second claim centered on the promissory notes and the deed of trust that secured them.  The court also relied on Restatement (Second) of Judgments sec. 22(2) (1982) by finding that successful prosecution of the second claim would not nullify or impair the rights established in the initial judgment.

Here, Plaintiff's claims alleging violation of the FMLA and wrongful discharge do not arise out of Defendant's counterclaim that Plaintiff's return of an Ipad and cell phone or pay personal charges on his company credit card. While there may be a logical relation because the Plaintiff's claim is against his former employer, the facts that support each claim are radically different: the FMLA and wrongful discharge involve medical/mental issues, work performance and actions taken by the Defendant to comply with the law. Whereas, Defendant's counterclaim simply involves return of the equipment and calculation of the personal charges owed to Defendant. As in *Valley View Angus Ranch, Inc. v. Duke Energy Field Services, Inc.,* 497 F.3d 1096 (10th Cir. 2007) the nexus between the facts is too attenuated to meet the requirements of a compulsory counterclaim.

**Moreover, Plaintiff does not dispute that he owes charges for his personal expenses or that the equipment belongs to the Defendant.**  Hice depo. 393. In fact, he has always

charged personal expenses and paid the expenses, including late fees, and was doing an expense report the day he was fired. Hice depo. 393. Defendant's counterclaim is analogous to an action on a cognovit note as it simply seeks to recover money. When there is a cognovit judgment Debtors' subsequent claims against the creditors have invariably been found not to be compulsory to the initial action to recover the money. *Sapp v. Azar,* 53 Ohio App.2d 277, 373 N.E.2d 398 (1977)(compulsory joinder rule of 13(A) does not bar a subsequent action on a secondary claim against the judgment holder because it is not directly related to the subject matter or transaction underlying the note itself.)

Here, the counterclaim claim does not involve work performance, medical/mental issues, or Defendant's compliance with the FMLA or seek recovery of lost wages. Based upon the above, Plaintiff's FMLA and wrongful discharge claims are not compulsory claims because they involve vastly different facts and issues and do not involve duplication of effort of the parties or the court. Wherefore, Defendant's motion should be denied.


II.     **Plaintiff has Presented a Prima Facie Case of a Family Medical Leave Act Violation. There are Genuine Issues of Fact Regarding Whether the Defendant Complied with it Duties Under the Law.**

The Family Medical Leave Act [herein after referred to as "FMLA"] makes it unlawful for an employer to interfere with, restrain or deny the exercise of or the attempt to exercise any right provided for under the act. *Saroli v. Automation & Modular Components, Inc.,* 405 F.3d 446, 440 (6th Cir. 2005). The FMLA provides for two theories of recovery—the "entitlement" or "interference" theory arising from 29 U.S.C. sec. 2615(a)(1) and the "retaliation" or

"discrimination" theory arising from 20 U.S.C. sec. 2615(a)(2). *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 555 (6th Cir. 2006).

The "entitlement" or "interference" theory is derived from the FMLA's creation of substantive rights. If an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *Arban v. West Publishing Corp.,* 345 F.3d 390, 401 (6th Cir. 2003), citing *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir 1999).

The issue is simply whether the employer provided its employee the entitlements set for in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave. Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer.

*Id.* citing *Hodgens v. General Synamics Corp.,* 144 F.3d 151, 159 (1st Cir 1998). An employee may be lawfully dismissed, preventing him from exercising his statutory right to FMLA eave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking leave. *Arban v. West Publishing Corp.,* 345 F.3d at 401, citing *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1262 (10th Cir. 1998). While an employer may terminate an employee for poor performance, a question of fact arises when the employee casts doubt upon both the timing of and the reasons for the decision to terminate him. *Id.* For example, the timing of the discharge could lead a trier of fact to infer that the employee would not have been fired if she had not taken a leave if i.e. the supervisor was aware of the problems and did not decide to terminate her until she took leave, and the supervisor based the decision on events of which he had already been aware of. *Id.* at 402, citing *Kohls v. Beverly enters. Wisconsin, Inc.,* 259 F.3d 799, 806 (7th Cir. 2001).

The trier of fact may find in an employee's favor if he presents evidence sufficient to establish that he was denied his substantive rights under the FMLA "for a reason connected with his FMLA leave." *Id.* For example, in *Miller v. Defiance Metal Prods., Inc.,* 989 F.Supp. 945, 946 (N.D. Ohio 1997) the court noted that the plaintiff's termination due to absenteeism caused by a medical condition constituted "an interference under the FMLA."

A. Defendant is an Employer and Plaintiff is an Eligible Employee under the FMLA.

There is no question that the Defendant and the Plaintiff have met the statutory requirements as an employer and an eligible employee under the FMLA. Defendant meets the requirements under 29 U.S.C. sec. 2611(4)(A) because it engages in commerce and employs more than 50 employees each working day during 20 or more calendar workweeks in the current or preceding calendar year. Plaintiff is an eligible employee because he has been employed by Defendant for 12 months and has worked at least 1250 within the previous 12 months. 29 U.S.C. sec 2611(2)(A).

B. Plaintiff Suffers from a Serious Health Condition.

An employee is entitled to a total of 12 workweeks of leave during any 12-month period for a serious health condition. 29 U.S.C. sec. 2612(a)(1)(D). A serious health condition means an illness, injury or mental condition that involves in-patient care or continuing care under a health care provider as defined in CFR 825.115;  CFR 825.113. CFR 825.115 defines continuing treatment as being: (1) an incapacity of more than three consecutive, full calendar day and any subsequent treatment that involves treatment two or more times within 30 days of the first day

of incapacity by a health care provider; treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. And, the treatment by a health care provider means in person visit that takes place within the first 7 days of the first day of incapacity; or (2) any period of incapacity or treatment for such incapacity due to a chronic serious health condition.

In 2000 Plaintiff thought he was having a myocardial infarction and went to an emergency room. Exhibit 1.  He did not have a heart problem, but it was not explained to him that he was suffering from "anxiety/panic attack." Exhibit 1 at 2.  In 2004 after the death of another friend, he consulted with Constance Fox, M.D. Exhibit 1 at 2. Dr. Fox diagnosed Plaintiff as suffering from General Anxiety Disorder and was prescribed medication. Exhibit 1 at 2.  The anxiety would cause shortness of breath, be on high alert or feeling overwhelmed. At times, Plaintiff would get quiet, have recurring thoughts, which may or may not occur with fear.  Exhibit 1 at 2.

In 2013, Plaintiff met Sarah Jahnke. They dated several times. In the summer of 2013, Plaintiff did not want to continue the relationship, and began to distance himself from her. She disagreed and began to stalk him, appearing at his house unannounced and unwelcome, sending him frightening texts, repeated phone calls and being disruptive. He became so concerned for his safety that he contacted the Cincinnati Police and ultimately obtained a five year protective order. Exhibit 1 at 4. As a result, Plaintiff was losing sleep and having difficulty concentrating on his work. Exhibit 1 at 4. He reported these problems to his employer, but believed that it did not appreciate how stressful the situation was.  He continues to be on "high alert."  **The interaction with Ms. Jahnke "directly negatively affected his mental health and generated the condition of Post-traumatic Stress Disorder."**  Exhibit 1 at 7. **As opined by Dr.**

**Nizny, the combination of longstanding Generalized Anxiety Disorder and the emergency of Post-traumatic Stress Disorder constitute a serious health condition for which medical treatment is necessary.** Exhibit 1 at 7. Plaintiff has been in continuous medical/psychiatric treatment from January 11, 2010 through and including the present date. Exhibit 1 at 7.

Based upon the foregoing, Plaintiff suffers from a serious health condition because he has a mental condition that involves, and he has had, continuing care under a health care provider as defined in CFR 825.115; CFR 825.113. CFR 825.115 defines continuing treatment as treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider. And, the treatment by a health care provider means an in person visit that takes place within the first 7 days of the first day of incapacity.

C. Plaintiff's Need for FMLA was Unforeseeable. Plaintiff's Behavior on August 23, 2013 and August 26, 2013 was so Unusual that it Gave Defendant Notice of his Need for FMLA Leave. Defendant Failed to Provide Plaintiff with a Vacation Day for August 23, 2013.

There are material questions of fact regarding whether the Defendant complied with its duties under the FMLA. Since Plaintiff's need for leave was unforeseeable, he was not required to specifically state the reasons why he needed time off; he had accrued vacation time and requested to use vacation time for August 23rd . As such, the Defendant was required to give him the paid vacation days due and sufficient facts were given to the Defendant to require it to investigate further to determine if the leave was for an FMLA qualifying reason.

Defendant claims that it was unaware of the conditions. Motion at 12. Yet, as early as 2012 it was common knowledge around the office that Plaintiff suffered from anxiety. Group Exhibit

6. These emails were open for all employees' view. More specifically Bonner knew that Plaintiff had "sleeping issues" as early as June 28, 2013. Exhibit 5. And, Bonner was clearly aware that Plaintiff suffered from health issues: on August 1, 2013, Bonner emailed Plaintiff that he "just want[s] you to be healthy." Exhibit ___ Again, all emails are available for view to all employees. In August 2013, when Rath was at Jahnke's house and Plaintiff was there returning the dog cage, he verbally told Rath that the situation was really affecting him. Hice depo. 231. Most telling is Fischer telling Bonner that Plaintiff just wasn't right and something was off. Fischer depo. 20. Defendant was aware that he contacted LifeWorks, had called the police, was attempting to get a restraining order and requested a meeting with HR. Clearly, he was very shaken, upset, concerned for his safety. Also, Luther acknowledged that this was affecting his work. Luther depo. 31. This unusual behavior gave the Defendant constructive notice of his need for FMLA leave. *Stevenson v. Hyre Electric Co.,* 505 F.3d 720, 726 (7th Cir 2007).

In order to invoke the protection of the FMLA, an employee must provide sufficient information to the employer to reasonably determine whether the leave was requested for an FMLA qualifying reason. *Miles v. Nashville Elec. Service,* No. 12-6028 (6th Cir. May 9, 2013). When the need is unforeseeable and the employee seeks leave for the first time for an FMLA qualifying reason, the employee need not expressly assert his rights under the FMLA or even mention the FMLA. 29 C.F.R. sec. 825.303(b). In fact, an employee who wishes to use accrued paid leave may not explain the circumstances right away:

…An employee using accrued paid leave may in some cases not spontaneously explain the reasons or their plans for using their accrued leave. However, if an employee requesting to use paid leave for an FMLA-qualifying reason does not explain the reason for the leave and the employer denies the employee's request, the employee will need to provide sufficient

information to establish an FMLA-qualifying reason for the needed leave so that the employer is aware that the leave may not be denied and may designate that the paid leave be appropriately counted against (substituted for) l for the employee's FMLA leave entitlement….

29 C.F.R. 825.301(b).

The employer also has duties under the Act. When an employee requests leave or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of his eligibility to take FMLA leave within five-business days, absent extenuating circumstances.  29 C.F.R. 825.300(b)(1).

Plaintiff suffered from Anxiety/Panic Attacks since 2004. He had difficulty sleeping and was often working late into the early morning. This lack of sleep would cause him to oversleep. Plus, the prescribed medications would leave him groggy in the morning. Mark Bonner and his co-workers were aware of this behavior.  Exhibits 5 & 6.

The Defendant does not have set hours that the traders must be in the office. Fischer depo. Pg. 11. Traders often work from home, particularly if they deal with different ports in different time zones. Fischer depo. 12. During the summer of 2013 Plaintiff became so concerned for his safety that he stayed in hotels and at his parents; and even before he obtained the protective order he changed the locks on the doors; he keeps ADT signs in his yard; and doesn't go to restaurants or bars in Hyde Park. Report at 6. Plaintiff told Mr. Bonner about Jahnke's behavior, that he was in fear and it was stressful. Hice depo. Pg. 284, 303.

On Friday August 23, 2013, Plaintiff was not feeling well, and worked at home as he often did. Hice depo. 191, 186, 131. On that day, he contacted the following accounts: Joe Apkin, Natassja, George Eten, Eric Rolf, Metal Green Recycling, Michael Gilligan, Harding Metals, INc.,

John Catalano, Keith Schultz, Deanna Montgomery. Group Exhibit 2. He also contacted Mr.

Bonner to notify him he would not be in and requested a vacation day. Exhibit 3.

### III. There are Material Questions of Fact Regarding Whether Plaintiff's Work Performance was Satisfactory, and Thus Whether Defendant's Allegations of Unsatisfactory Performance are a Legitimate Reason for His Termination.

Defendant claims that it terminated Plaintiff because he was unavailable on certain

days, because he made personal charges on his company credit card and did not pay the bill in

full and because customers complained. Motion at 5, 7, The Defendant does not have a specific

policy for discipline. Luther depo. 10.  It disciplines by "conversations" that are sometimes

documented. Luther depo. 10-11. The incidents of "unavailability" were February 13, 2013,

June 20, 2013 and August 23, 2013. As aforestated, on February 13, 2013, Plaintiff was driving

back to Cincinnati, Ohio when Luther emailed him. As soon as he received the email, he

responded. Group Exhibit 2. He also worked that day. Group Exhibit 2.

As aforestated, on June 20, 2013, Plaintiff contacted Bonner at approximately 5:30 a.m. and

told him that he could not make the photo shoot due to a family member being sick. Hice depo.

168; Group Exhibit 4. It appears that Bonner did not tell Luther about the call because she told

Plaintiff that he did not let her know. Group Exhibit 4. Plaintiff worked that day. Group Exhibit

4.

On August 23, 2013, Plaintiff contacted LifeWorks and followed the representative's

directives. Hice depo. 215-16. He left his house, notified Bonner and worked.[1] Group Exhibit 7.

---

[1] Plaintiff did not take his phone to his parents' house. He was so shaken that he thought it sent the email earlier in the day. Hice depo. 214.

As for the credit card charges, Plaintiff had been placing personal charges on the card for years. Group Exhibit 10; Hice.  He knew he was responsible for the bill. Group Exhibit 4. He also made the payments and paid all late fees. Group Exhibit 10. Plaintiff does not recall anyone speaking with him regarding not placing personal charges on or keeping a balance on the card. Hice depo. 56-57.

As for his work performance, Hice was never "coached" nor had "conversations" where he was disciplined or given any indication that he would be terminated. Bonner told him that his margins were good; he complimented Plaintiff's work, said "good margins";  Bonner was wrong about a certain load not being a good dealt. Hice dep. 200-03, 237-38. Plaintiff was never spoken to, written up or disciplined in any for not keeping management informed. Hice depo. 78. He did not miss two consecutive days as claimed by Bonner. Even though he was sick, he was in the office one-half day both of the days Bonner claims he missed. Hice depo. 191-92. And, Bonner seems to talk about Plaintiff's health, not his attendance. Hice depo. 193-94. Bonner did not even look at the emails on August 23rd to determine whether or not he had been working. Bonner depo. 89. He was never spoken to about keeping management informed. Hice depo. 178. And, Bonner even told him that "[I] don't care if you show up a litter later than the rest…." Exhibit 11. Ben Reynolds was a co-worker of Plaintiff's. Reynolds had performance problems.  So, instead of terminating him like Plaintiff,   Bonner took away some of his responsibilities  Bonner depo. 61-71. Plaintiff's margins and volume were higher than Reynolds. Bonner depo. 113.

However, Robert Angotti, the executive vice president of broker and service group, testified that he made the decision to terminate the Plaintiff. Angotti depo. Pg. 52-53. He

testified that he walked into the room and overheard a conversation regarding the Plaintiff, and he made the decision. Angotti depo. pg. 10-11. He was told that they "had not been able to reach him for a couple of days."[2] Angotti depo. pg. 36. He also referenced the credit card payments and responding to customers. Angotti depo pg. 35. Plaintiff adamantly disagrees with the complaints about his margins. Hice depo. pg. 195. He insists that 2013 was a bad year for this industry as a whole and there were deals that were "fantastic" according to Mr. Bonner. Hice depo. Pg. 196. Plaintiff also kept his records up to date. Exhibit 4.

IV. **Ohio has a Clear Public Policy Against Stalking and the Issuance of Protective Orders Against Stalkers. There are Material Questions of Fact Regarding Whether Plaintiff was Terminated for Seeking a Protective Order Against his Supervisor's Sister-in-Law.**

Defendant argues that Plaintiff cannot establish a state wrongful discharge claim because he cannot point to a public policy that was violated. This argument fails because Ohio has a clear public policy against stalkers and the issuance of protective orders to prevent harm to the victims. In order to establish a violation of state wrongful discharge in Ohio, a plaintiff must show:

1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation or common law;

2. The dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy;

3. The plaintiff's dismissal was motivated by conduct related to the public policy;

---

[2] This is an untrue statement because Plaintiff had spoken with Mr. Fischer and emailed Mr. Bonner on the 23rd, emailed Ms. Luther on the August 25th and met with them on Monday August 26, 2013.

4.  The employer lacked overriding legitimate business justification for the dismissal.

*Wiles v. Medina Auto Parts,* 96 Ohio St.3d 240, 773 N.E.2d 526 (2002).


Ohio has long recognized a public policy in protective victims of domestic violence. In *Felton v. Felton,* 79 Ohio ST.3d 34, 679 N.E.2d 672 (1997), regarding public policy, the court stated:

> The General Assembly enacted the domestic violence statutes specifically to criminalize those activities commonly known as domestic violence and to authorize a court to issue protective orders designed to ensure the safety and protection of a complainant in a domestic violence case.

*Id.* at 37, 679 N.E.2d at 675.

Similarly, the General Assembly enacted the Menacing by Stalking statute to criminalize the activities known as stalking and to authorize a court to issue protective orders designed to ensure the safety and protection of the complainant in a stalking case. O.R.C. 2903.211; 2903.213; 2903.214. O.R.C. 2903.211(A) specifically provides that "no person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person…." Clearly, this statute evidences a clear public policy against stalking and protecting victims of stalking.

Here, Jahnke stalked and threatened the Plaintiff to the point that he believed that she would cause him physical harm. Hice 303-04; Exhibit 1. And, in fact, the stalking caused Plaintiff mental distress. Exhibit 1.  Terminating an employee for seeking protection under the statute would violate this policy. Hice was not written up or disciplined in any way until he began having problems with Jahnke. The Defendant has no specific discipline policy. Luther depo. 10. They "coach" with conversations. Luther depo. 10. Plaintiff was hesitant to seek a protective

order because Jahnke was his supervisor's sister-in-law; she had threatened to have him fired; and he thought it would affect his employment. In fact, he was fired the next day after Rath became aware the he was filing for a protective order. Hice depo. 377-380. Although Rath denies that it had anything to do with the termination, at the meeting, Rath wanted to see the videos, see the text messages and asked Plaintiff not to have the protective order served at work. As aforestated, there are material questions of fact regarding Defendant's alleged justification for the termination. There is no documentation supporting any type of prior discipline. He was simply fired for seeking the protective order against his supervisor's sister-in-law. Wherefore, the motion should be denied.

CONCLUSION

The motion should be denied because, first, `the counterclaim and the instant complaint do not arise out of the same transaction or occurrence. The only connection is that the Defendant employed the Plaintiff. Plaintiff admitted he was responsible and had always paid the credit card. He was doing an expense report the day he was fired. The equipment was the Defendant's. The FMLA involves many issues and facts not related to collecting the personal expenses on the credit card and returning the Ipad.

Second, the Plaintiff has shown a prima facie case of an FMLA violation. There are material questions of fact regarding whether Defendant complied with its duties under the Act.

Third, there are material questions of fact regarding whether the Plaintiff's work performance was satisfactory and whether the Defendant's proffered reasons for termination are a pretext.

Fourth, Ohio has a clear public policy against stalking and the issuance of protective orders against stalkers. There are material questions of fact regarding whether Plaintiff was terminated for seeking a protective order against his supervisor's sister-in-law.

Based upon the foregoing, the motion should be denied.

Respectfully submitted,


/s/ Teresa Cunningham
Law Office of Teresa Cunningham
312 Walnut St., Suite 1600
Cincinnati, OH 45202
513-939-4749
859-371-7301 fax
tcunningham@isoc.net


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was mailed to the following this 11th day of March 2016: Patricia Pryor, Jackson Lewis, PC, 201 E. Fifth St., 26th Floor, Cincinnati, OH 45202; all parties will also receive notice via the Court's electronic filing system on March 10, 2016.


/s/ Teresa Cunningham
Teresa Cunningham