UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Nathan Hice,                                    :      Case No. 1:15-cv-534
                                                :
     Plaintiff,                                :
                                                :
vs.                                             :
                                                :
The David J. Joseph Company,                    :
                                                :
     Defendant.                                :

## ORDER

Before the Court is Defendant's motion for summary judgment.  (Doc. 16)

Defendant argues that Plaintiff's claims are compulsory counterclaims that should have

been raised in Plaintiff's prior state court lawsuit against Defendant.  Plaintiff failed to

plead his claims in that lawsuit, and his attempt to litigate them here is therefore barred.

Defendant also contends that Plaintiff's claims for violation of the Family and Medical

Leave Act ("FMLA") and wrongful termination both fail as a matter of law.  Plaintiff

opposes the motion (Doc. 30), and Defendant filed its reply.  (Doc. 45)  For the following

reasons, the Court will grant Defendant's motion.

## FACTUAL BACKGROUND

Plaintiff Nathan Hice began working for the David J. Joseph Company ("DJJ") in

2006.  DJJ is a commercial scrap metal broker.  Hice started working for the company in

Philadelphia in the ferrous metals brokerage group.  He transferred to the Cincinnati

office in 2009, to a position in the non-ferrous metals group.  In August 2011, Hice

voluntarily quit his job; DJJ asserts that Hice failed to give the company sufficient notice

of his departure.  Hice changed his mind a short time later, however, and asked if he

could return.  Rob Angotti, DJJ's Vice President for Brokerage and Services, was reluctant to allow Hice to return.  But Angotti left the decision to the brokerage team in Cincinnati.   Mark Bonner was a broker in that group at the time, and he states that he voted to allow Hice to come back because DJJ was understaffed at that time.  Mark Bonner became Hice's direct supervisor in late 2011.  (Doc. 16-3, Bonner Dec. at ¶2)  Bonner testified that by 2013, Hice's performance had deterioriated.  His responsiveness to Bonner's communications decreased, and Bonner received complaints from some of Hice's customers and suppliers.

Hice was issued a DJJ credit card, which was to be used only for business-related expenditures.  Hice was not permitted to carry a balance on that card and was supposed to pay any balance due on a monthly basis.  He admitted that in 2013 he charged personal expenses to that card, and that by the late spring or early summer of that year, there was an unpaid balance on the card.  Hice claimed that on occasion, he would allow a balance to go unpaid but he would simply pay any applicable late charges.  Terry Rath, the Vice President of DJJ's metals group (and Bonner's direct supervisor), states in his declaration that DJJ's finance department contacted him about Hice's card balance.  Rath told Hice that he must stop using the card for personal items and must pay off the balance.  (Doc. 16-2 at ¶3)

Sometime in 2013, Hice began dating a woman named Sarah Jahnke, who was Terry Rath's sister in law.  When Hice told Rath about this relationship, Rath responded that he did not want to get involved, and what Hice did on his personal time was his business.  (Id. at ¶4)

Bonner states that on three occasions in 2013, Hice failed to come to work, or

was unavailable by telephone or email, and failed to get in touch with Bonner.  The first incident was on February 13, 2013 when Bonner was unable to reach Hice until late afternoon.  Another employee told Bonner that he had seen Hice the night before at an out-of-town convention, where he had too much to drink and engaged in inappropriate conversations with DJJ customers.  The second occasion was June 19-20, 2013.  Hice informed Bonner early in the morning on June 19 that he had to attend to personal matters and would not be at work that day.  But the next day, June 20, Hice failed to appear at a scheduled appointment for a company photography session to produce new marketing materials.  Bonner testified that Hice did not call or inform Bonner of his whereabouts, and failed to respond to telephone calls and messages from other company employees.  Hice reported later in the day that he had been up all night with an ill family member.  Later on, Hice admitted that he had been with Ms. Jahnke, not a family member.  The third no-show occasion was Friday, August 23, 2013, when Hice failed to report to work and did not call Bonner.  Hice did not respond to Bonner's call, email or text, and none of the other traders had heard from Hice that day.  At 3:48 p.m. that afternoon, Hice finally responded to Bonner.  (Doc. 16-3, Bonner Decl. at ¶¶ 6-9, PAGEID 385-386)

By August 23, Hice had decided to seek an order of protection against Ms. Jahnke, who had been engaging in irrational and threatening conduct towards him. Sometime in July, Hice was forced to call the police when she would not leave his home, and a police officer warned Ms. Jahnke not to contact Hice again.  Despite that warning, she continued to do so.  Hice and his father, accompanied by a police officer, went to Jahnke's home on August 10 to deliver a new dog cage.  While they were there,

Terry Rath and his wife arrived at Jahnke's house and witnessed the police officer telling Jahnke to cease contact with Hice.  Hice explained the problem to Rath, and said that "it was really affecting him."  (Hice Dep. at 231)  Ms. Jahnke was apparently undeterred and continued to appear at Hice's house, screaming at him outside.  Hice claims he told Bonner about Ms. Jahnke stalking and harassing him, but could not recall specifically what he told Bonner.  Hice said he spoke to Bonner sometime in August on a Friday, but did not know the specific date.  (Id. at 282-283)

On the night of Thursday, August 22, Jahnke repeatedly called and texted Hice, and Hice believed some of these messages were threatening.  He called DJJ's Employee Assistance Program "helpline" about the situation.  The EAP representative advised him to leave his house, go to a safe place, write a note to his supervisor about the urgency of the situation, and report the problem to Human Resources on Monday morning.  Hice went to his parents' house early in the morning, and claims that he did not sleep all night.  Attached to his opposition brief is an unverified document, which appears to be a "screen shot" of a text message he allegedly sent to Mark Bonner on August 23, 2013 at 3:48 p.m. (the time that Bonner states he first heard from Hice on that day).  This message states: "Unfortunately, today I had some pressing issues that I needed to deal with.  I will do my best to check on email and phone calls but for the majority of the day I will be  unavailable.  I want to sit down and speak with you about this matter but I would like to request a vacation day due to this circumstance or ask that you would not need to pay me for a day where I cannot perform my job duties to my fullest capabilities."  (Doc. 30-8)  Hice also sent an email on Sunday August 25 to Karen Luther, who works in human resources at DJJ, asking for a meeting with her on

-4-

Monday.

Hice went to Luther's office on Monday August 26 to meet with her, and began to describe his difficulties with Ms. Jahnke and his concerns about his safety. Luther called Mark Bonner to come to her office, so that Bonner could participate in the discussion. Luther testified that she asked Hice if he needed to take a leave of absence, and Hice said he did not. Hice claims that Luther did not mention a leave of absence during that meeting. (Hice Dep. at 320) Hice told Luther and Bonner that he had already made an appointment with the court to obtain an order of protection, and according to Luther, he appeared to have taken all appropriate steps to address Ms. Jahnke's behavior. Hice worked the rest of that day.

The next day, Tuesday August 27, Hice arrived at work and Bonner asked him to come to a conference room to meet with Luther, Bonner and Rath. Hice said that   Rath asked him questions about the situation with Ms. Jahnke, and Hice played a voicemail message that she had left on his telephone. Hice testified that he felt this meeting was not "all that warm and fuzzy," and he asked if his job was in jeopardy. (Hice Dep. at 313) They responded that it was not, but Hice believed that Rath was primarily focused on the details of his plan to obtain a restraining order, and not on the situation's effect on Hice. Hice also testified that Rath mentioned something about a partial leave from work or unpaid time off, but Hice was not thinking about leave because he had accrued vacation time. (Id. at 320-321)

Rob Angotti, DJJ's Executive Vice President, happened to be in the Cincinnati brokerage office on August 27. Terry Rath reports to Angotti. Angotti overheard Rath and Bonner that day discussing Hice: "They had mentioned that they couldn't find him.

He was out of touch.  They said there was a credit card that had not been paid.  And that there were some issues with some customers on downgrades or money that was owed that he wasn't responding to the customer about." (Angotti Dep. at 35)  After overhearing this conversation, Angotti decided to terminate Hice.  He went to Luther's office, and told her that he wanted to fire Hice, explaining that it was "three strikes and you're out." (Id. at 52)  Angotti believed that Hice already had "two strikes" against him.  The first incident was in 2007 when Hice was in an accident while driving a DJJ company car; this occurred when Hice worked in DJJ's Philadelphia office.  Hice drove home from a restaurant/bar early one morning and got into an accident.  He left the scene, and told the police and DJJ that the car had been stolen.  He eventually confessed to the true facts; DJJ decided not to terminate him and give him another chance.  (Doc. 16-1, Angotti Dec. at ¶4; Hice Dep. at 62-66)  The second incident was Hice's decision to voluntarily resign from DJJ in 2011.  As noted above, Hice changed his mind a few weeks later, and he was allowed to return to the non-ferrous metals brokerage group even though Angotti was opposed to allowing him to do so.

Angotti testified that it was his decision alone to terminate Hice after he heard Rath and Bonner discussing Hice's conduct, and he thought that Rath and Bonner were trying to protect Hice.  Luther testified that Angotti walked into her office and said, "I was just over at the metals group and Terry told me what's going on with Nate.  Three strikes, he's out.  He's gone.  I want him terminated today." (Luther Dep. at 63)  Luther learned that day about Hice's credit card charges, and the problems Bonner and Rath had with Hice's attendance.  She also learned (apparently from Angotti) about the 2007 car accident.  In view of these issues, she agreed with and supported Angotti's decision.

-6-

(Id. at 71)   Later that same day, Hice was terminated.

On February 6, 2014, Hice filed a single-count complaint against DJJ in state court, alleging wrongful termination in violation of Ohio public policy.  (Doc. 16-5, Ex. A)  DJJ answered and filed a counterclaim for money damages in the amount of Hice's unpaid credit card balance, and seeking the return of his company-owned cell phone and iPad.  (Id., Ex. B)  After the parties engaged in written discovery and depositions, DJJ moved for summary judgment on Hice's complaint and its counterclaim.  Hice responded by voluntarily dismissing his complaint without prejudice, pursuant to Ohio Civ. R. 41(A)(1)(a), and stating that the counterclaim remained pending for independent adjudication.  (Id., Ex. C)  The state court granted DJJ's motion for summary judgment on its claim of conversion of the iPad and iPhone, and held in abeyance a judgment on the credit card issue to allow the parties to try to resolve the matter.  (Id., Ex. D) Those attempts apparently were unsuccessful, as the common pleas court issued a decision granting DJJ summary judgment on the credit card claim, entering judgment in favor of DJJ in the amount of $1,904.  (Id., Ex. E) In its decision, the court cited Hice's admission that he used the credit card for personal charges, and that DJJ had paid the balance due on his card.

Hice filed his complaint in this case on August 14, 2015, alleging claims for wrongful termination in violation of Ohio public policy, and under the Family and Medical Leave Act ("FMLA").  He alleges that he suffers from a serious medical condition that rendered him unable to perform his job duties, that he was entitled to FMLA leave, and that DJJ denied him FMLA benefits to which he was entitled.  He also alleges that his termination violated the clear public policy of the State of Ohio "for asserting the legally

-7-

guaranteed right of obtaining a protective order," and that his termination was motivated by conduct related to this clear public policy.

DJJ's motion for summary judgment argues that both of Hice's claims are compulsory counterclaims that he should have raised in his prior state court action. Despite his voluntary dismissal of his complaint, when DJJ moved for summary judgment on its counterclaims, he was required to assert any claims he had against DJJ at that time.  Because he did not, DJJ argues he is estopped from litigating them in this forum.  With respect to his FMLA claim, DJJ notes it is unclear if Hice is alleging a claim of interference with his FMLA rights, or retaliation based on his exercise of FMLA rights. In either case, DJJ argues that he cannot establish a prima facie claim under the FMLA. Defendant also contends that Hice's wrongful termination claim fails because he cannot show that his termination was related to any clearly defined public policy.

## ANALYSIS

### Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of an undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

-8-

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002). Once that occurs, the non-moving party cannot simply assert the existence of a genuine factual dispute by relying on the pleadings. The non-moving party must come forward with affirmative evidence and identify specific facts in dispute.

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Id. at 249-50 (citations omitted).

The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Compulsory Counterclaims

DJJ argues that Hice's wrongful termination and FMLA claims were compulsory counterclaims that Hice should have raised in the state court action. Ohio Civil Rule 13(A) states: "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the

transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."  Fed. R. Civ. Proc. 13(A) is essentially identical to the Ohio rule.

DJJ cites Rettig Enterprises, Inc. v. Koehler, 68 Ohio St.3d 274 (Ohio 1994), where the Ohio Supreme Court discussed the proper application of Rule 13(A).  Relying on Geauga Truck & Implement Co. v. Juskiewcz, 9 Ohio St.3d 12, 14 (Ohio 1984), the court recited a two-pronged test that applies to determine if a claim falls within the Rule: "(1) does the claim exist at the time of serving the pleading ...; and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim."  If both are true, the claim is a compulsory counterclaim to claims raised in the prior action.  Rettig arose from a dispute over the sale of a business.  The parties reached a settlement in their initial lawsuit; a few months later Rettig filed another complaint alleging that the defendants breached the settlement agreement and failed to pay money due under its terms.  Defendants filed a counterclaim in the second action, alleging Rettig owed them money for items purchased during the pendency of the first lawsuit.

The second lawsuit proceeded to trial, but the court determined that the parties failed to perform a calculation required by their settlement agreement, which the court needed in order to resolve all the disputes raised in the second lawsuit.  The court ordered the parties to complete that calculation and submit it to the court, and it would enter judgment thereafter.  Rettig then filed a motion to dismiss its complaint under Rule 41(A).  The trial court granted that motion, dismissing the complaint without prejudice,

-10-

but based its order on the parties' failure adhere to the court's order to complete the calculation. Trial in that second lawsuit continued on the defendants' counterclaims, and judgment was eventually entered in their favor.

Rettig then filed a third lawsuit, seeking an order requiring defendants to finish the calculations ordered by the court in the second lawsuit, and a judgment for inventory charges allegedly incurred before the first lawsuit was filed. The trial court dismissed Rettig's third complaint, finding that its claims were compulsory counterclaims that should have been raised in the second lawsuit, when defendants' counterclaims were tried and judgment was entered. The Ohio Supreme Court affirmed the trial court's judgment. It was undisputed that the plaintiff's claims in the third lawsuit existed at the time of the second lawsuit. To determine whether those claims arose from the "same transaction or occurrence," the Supreme Court cited the staff notes to Ohio Civil Rule 13, and discussed and applied the "logical relation" test: "...a compulsory counterclaim is one which is logically related to the opposing party's claim where separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the courts." The court stated that the purpose of the Rule is to

> ... avoid a multiplicity of actions and to achieve a just resolution by requiring in one lawsuit the litigation of all claims arising from common matters. ... 'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship. ... That they are not precisely identical, or that the counterclaim embraces additional allegations ... does not matter. ... [C]ompulsory counterclaims [are claims] that involve many of the same factual issues, or the same factual and legal issues, or where they are offshoots of the same basic controversy between the parties.

Rettig, 68 Ohio St.3d at 278-279 (internal citations and quotations omitted). The Ohio

-11-

Supreme Court also cited Great Lakes Rubber Corp. v. Herbert Cooper Co., 286 F.2d

631, 634 (6th Cir. 1961), where the Sixth Circuit explained the basis of the "logical

relationship" test:

> The phrase 'logical relationship' is given meaning by the purpose of the
> rule which it was designed to implement. Thus, a counterclaim is logically
> related to the opposing party's claim where separate trials on each of their
> respective claims would involve a substantial duplication of effort and time
> by the parties and the courts.  Where multiple claims involve many of the
> same factual issues, or the same factual and legal issues, or where they
> are offshoots of the same basic controversy between the parties, fairness
> and considerations of convenience and of economy require that the
> counterclaimant be permitted to maintain his cause of action. Indeed the
> doctrine of res judicata compels the counterclaimant to assert his claim in
> the same suit for it would be barred if asserted separately, subsequently.

DJJ argues that Hice's claims arise out of the same transaction that was at issue

in DJJ's counterclaim.  One of the reasons Hice was terminated was his misuse of the

company credit card for personal expenses, which he failed to pay.   DJJ cites Long v.

Welch & Rushe, Inc., 28 F.Supp.3d 446 (D. Md. 2014), where plaintiff brought Title VII

claims against her former employer after she was terminated in a reduction-in-force.

Her employer filed counterclaims for conversion and alleged that plaintiff misused her

company credit card, which was one of the reasons it chose plaintiff for termination.

Plaintiff moved to dismiss the employer's counterclaims, but the district court found they

were compulsory.  The facts supporting them were also directly relevant to the

employer's defense of plaintiff's Title VII claims.

DJJ also argues that none of the cases Hice relies on were employment cases,

and that courts routinely hold that the type of claims Hice raises here are compulsory in

similar circumstances.  See, e.g., Dooling v. Bank of the W., 2013 U.S. Dist. LEXIS

99638 (E.D. Tex., July 17, 2013), denying plaintiff's motion to dismiss former employer's

counterclaim for unjust enrichment, seeking reimbursement of an advance given to plaintiff for unearned vacation leave.  Plaintiff asked for a medical leave, and the employer told her it did not have to comply with the FMLA, so she took leave and was paid from unearned vacation time.  The district court held the employer's counter claim was compulsory because a jury would hear substantially the same facts regarding both claims.  And see Mannari v. Gryphus Enterprises LLC, 2008 U.S. Dist. LEXIS 38944 (E.D. Va., May 12, 2008), where the plaintiff alleged claims under the FLSA and ERISA against his former employer and its CEO; plaintiff moved to dismiss the CEO's defamation counterclaim, which was based on statements plaintiff made about the CEO after he was terminated.  The district court held the CEO's claim was a compulsory counterclaim because there was an "obvious logical relationship" between the claims: the allegedly defamatory statements were related to the facts surrounding plaintiff's termination, and the truth of those statements was at issue in both claims, even though the legal standards were very different.

Hice argues that his FMLA and public policy claims were not compulsory to DJJ's claims for conversion of the iPhone and iPad, and for money due and owing.  He relies on Valley View Angus Ranch, Inc. v. Duke Energy Field Services, Inc., 497 F.3d 1096 (10th Cir. 2007), which held that plaintiff's federal lawsuit for property damage and trespass were not compulsory counterclaims to defendant's previously-filed state court lawsuit alleging breach of an easement across plaintiff's property.  Defendant wanted to install gas monitoring wells on its easement after plaintiff notified defendant of a gas leak on its property, but plaintiff refused access.  The Tenth Circuit rejected defendant's motion to dismiss the federal suit, concluding that while both suits arose from events on

the same property, they involved different factual and legal issues. Hice suggests that his claims, like those in Valley View, involve different factual and legal issues from those implicated in DJJ's counterclaim, which simply sought the return of two items and a $1,904 money judgment. Litigating those claims would not involve any issues regarding Hice's work performance, his medical history, his claim of public policy involving orders of protection, or his alleged lost wages. And for that reason, there would be no undue duplication of effort required to litigate this case.

Neither party cites Wilson v. Jo-Ann Stores, Inc., 2012-Ohio-2748 (9th Dist. App. 2012), one of a few reported Ohio cases the Court has located involving a somewhat analogous employment-related dispute and the compulsory counterclaim rule. In that case, plaintiffs filed suit against the employer after they were fired, alleging discrimination and intentional infliction of emotional distress. The employer filed a replevin counterclaim seeking the return of internal company documents in plaintiffs' possession. The documents were returned shortly thereafter but plaintiffs did not formally respond to the counterclaim. After the employer sought summary judgment on the employees' claims and a default judgment on the counterclaim, the plaintiffs voluntarily dismissed their complaint without prejudice. The trial court granted a default judgment and nominal damages on the employer's replevin counterclaim.

Plaintiffs then filed a second complaint against the employer, raising the same claims that they voluntarily dismissed in their first lawsuit. The employer moved to dismiss, arguing they were compulsory claims barred by res judicata. The trial court agreed, but the court of appeals reversed. It found that discrimination and retaliatory discharge claims are distinctly different from a replevin claim, as the latter simply seeks

-14-

to recover goods from one who wrongfully retains them when the suit is filed.  It does

not require an unlawful or wrongful taking, as a plaintiff need only show that he is

entitled to the goods and that the defendant has possession of them.  The court of

appeals also noted that the employees had returned the documents shortly after the

counterclaim was filed, and there was no suggestion that the documents were even

remotely relevant to the plaintiff's discrimination claims.  The appeals court rejected the

trial court's reasoning, which relied heavily on Rettig, that the plaintiffs' claims were

"offshoots of the same basic controversy between the parties."  In the absolute broadest

sense that was true; but it was also true that the replevin claim could be determined

without any consideration of the facts surrounding plaintiffs' termination, and plaintiffs'

discrimination and IIED claims could be resolved without referring to the replevin claim.

    In its state court counterclaim, DJJ alleged that it permitted Hice "to borrow the

Company's cell phone and iPad in order to use the messages on them when he went to

court for his protective order."  (Doc. 16-5, Ex. B at p. 7)  DJJ also alleged that Hice had

not repaid personal charges he placed on the Company's credit card.  Unlike the

replevin claim discussed by the court in Wilson v. Jo-Anne Stores, DJJ's counterclaim

alleged conversion.  Conversion is the wrongful exercise of dominion over property to

the exclusion of the rights of the owner, or under a claim that is inconsistent with the

owner's rights.  Zacchini v. Scripps-Howard Broadcasting Co., 47 Ohio St.2d 224, 226

(Ohio 1976).  DJJ's conversion claim thus implicated the facts surrounding Hice's

termination, particularly his claim that he was allegedly fired because he intended to

seek a protective order against Ms. Jahnke. DJJ would have to prove its allegation that

it permitted Hice to initially retain its property and the reason for it, as well as the

-15-

subsequent events that supported the conversion claim.   Hice also testified that DJJ never required him to pay his credit card balance off entirely or at a certain time, and that there were times he could have been late in paying.  (Hice Dep. at 53-56)  This issue is also intertwined with DJJ's counterclaim against Hice for the personal credit card charges.  Both the Ohio Supreme Court and the Sixth Circuit have noted the salutary policies that underlie the compulsory counterclaim rule: to avoid a multiplicity of actions and avoid a substantial burden on the parties and on the courts.  Even though Hice chose to voluntarily dismiss his wrongful termination claim in his state court lawsuit, he was required to assert it as well as any other claims directly arising from his termination, when DJJ proceeded to the merits of its counterclaims.

FMLA and Wrongful Termination Claims

Even if Hice's claims are considered to be permissive and not compulsory, DJJ alternatively contends that Hice cannot state a prima facie FMLA claim, whether styled as an interference or retaliation claim.  The Court agrees.

To establish a prima facie case of FMLA interference, Hice must show that: (1) he was an eligible employee; (2) DJJ was a covered employer under the FMLA; (3) he was entitled to take leave under the FMLA; (4) he notified DJJ of his intent to take leave; and (5) DJJ denied him FMLA benefits.  Edgar v. JAC Products, Inc., 443 F.3d 501, 506 (6th Cir. 2006).

Hice has not established a genuine factual dispute that he was entitled to take a leave under the FMLA.  Hice suggests that it was "common knowledge" at DJJ by 2012 that he suffered from anxiety, or had "sleeping issues."   He relies on unverified copies of what he asserts are internal emails (which he also claims were "open for all

-16-

employees' view") about his "sleeping issues" to suggest that DJJ or Ms. Luther should have known that he needed FMLA leave.  It is disingenuous for Hice to argue that DJJ should have known of his serious medical condition on August 23, 2013, yet also argue (as he does) that he did not discover the facts supporting his FMLA clam until Karen Luther's deposition was taken on December 4, 2014, during discovery in his prior state court lawsuit.  (See Doc. 30 at 10)   While the report from Hice's expert consultant, Dr. Nizny, states that Hice was under "continuous" medical or psychiatric treatment from January 11, 2010 to January, 2016 (when Hice consulted Dr. Nizny, Doc. 30-1 at 7, PAGEID 523), Hice's medical records reflect his visits with Dr. Smith (who was treating him for complaints of anxiety) on October 6, 2011, December 14, 2011, September 5, 2012, September 28, 2012 (when Hice reported that he was doing "much better" on a new medication), April 18, 2013 (when Hice reported that his anxiety is somewhat better), and January 31, 2014 (when Hice reported he was "still doing ok" and "no new issues").  (Doc. 14-3, Hice Dep. Ex. 60, at PAGEID 295-308.)  Hice has never been hospitalized or incapacitated; to the contrary, Hice claims that he was able to work throughout the period he consulted with Dr. Smith, including Monday, August 26 (after his meeting with Luther and Bonner), and the following day.

Even if he could demonstrate that he was entitled to take FMLA leave based on a serious health condition that rendered him unable to do his job, Hice has not shown that he notified DJJ of his intent or desire to take a leave, or that DJJ denied him any FMLA rights or benefits.  Hice concedes that he never asked to take a leave of any kind when he told DJJ that he would be seeking an order of protection against Ms. Jahnke. Rather, he argues that once he told DJJ (Luther, Rath and/or Bonner) about the

situation, DJJ had a duty to offer him FMLA leave without his request.  He argues in his opposition brief that after he asked for a vacation day on August 23, DJJ was "required to give him the paid vacation days due and sufficient facts were given to [DJJ] to require it to investigate further to determine if the leave was for an FMLA qualifying reason." (Doc. 30 at 20)   DJJ cites Brohm v. Jh Properties, 149 F.3d 517, 523 (6th Cir. 1998), in which the Sixth Circuit held that nothing in the FMLA statute "places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave."  And since Hice never asked for FMLA leave or other statutory benefits, it follows that DJJ did not deny him any rights under that statute.

Hice does not identify any direct evidence that might support an FMLA retaliation claim.  A prima facie retaliation case based on indirect evidence requires Hice to show that (1) he engaged in FMLA-protected activity; (2) DJJ was aware of that activity; (3) he was subject to an adverse employment action; and (4) a causal nexus exists between his protected activity and the adverse employment action.  Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012).  For the same reasons discussed with respect to his interference claim, Hice has not shown that he engaged in any protected activity.  He did not ask for leave or otherwise assert any rights he had under FMLA.  Moreover, Hice does not contest DJJ's evidence that it was Angotti alone who made the decision to fire Hice on Tuesday, August 27.  And there is no evidence that Angotti knew anything at all about Hice's situation with Ms. Jahnke, his decision to obtain an order of protection, or his anxiety or "sleeping issues."  Hice suggests that Rath was antagonistic

to him because Ms. Jahnke was his sister-in-law. But Angotti's testimony is unrebutted that he alone made the decision after he overheard Rath and Bonner discussing Hice's failure to report to work, complaints from customers, and learning that he had an unpaid balance on his credit card.

Temporal proximity between protected activity and an adverse employment action may, in some cases, be sufficient to satisfy the causal link of a prima facie case. See, e.g., Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007)(plaintiff was terminated on the very day her FMLA leave expired, and she offered evidence that her supervisor was angry about her leave and told other employees that she would see to it that plaintiff did not have a job to return to; this was sufficient to satisfy her prima facie retaliation claim). But here, the proximity between Hice's discussions with Luther and Bonner about Ms. Jahnke and his termination is not sufficient to give rise to an inference of causation, in view of Angotti's unrebutted testimony, and the lack of evidence that Hice ever engaged in FMLA-protected activity.

Finally, DJJ seeks judgment on Hice's state law claim for wrongful termination in violation of public policy. To establish a prima facie claim of wrongful discharge in violation of public policy, Hice must satisfy four elements:

> (1) that there exists a clear public policy that is manifested in a state or federal constitution, statute, or administrative regulation, or in the common law (the "clarity" element), (2) that dismissal of employees under circumstances like those involved in the plaintiff's dismissal would jeopardize that public policy (the "jeopardy" element), (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the "causation" element), and (4) that the employer lacked overriding legitimate business justification for the dismissal (the "overriding justification" element).

Collins v. Rizkana, 73 Ohio St.3d 65, 69-70 (1995). The first and second elements are

questions of law decided by the Court, while causation and overriding justification are generally issues for the trier of fact. Id. at 70.

DJJ argues that Hice has not satisfied the clarity element. Hice's complaint alleges that the State of Ohio has "a clear public policy for asserting the legally guaranteed right of obtaining a protective order." (Doc. 1 at ¶40) In his opposition brief, Hice refers to Ohio statutes criminalizing domestic violence, and cites a "menacing by stalking" statute, Ohio Rev. Code 2903.211(A). Even if the prevention of stalking and domestic violence are clear policies of the State of Ohio, DJJ contends that Hice has failed to establish a genuine factual dispute about the causation element, as he cannot show that his termination was motivated by conduct that is related to that public policy. As discussed above, Hice does not dispute Angotti's testimony that he alone decided to terminate Hice. And there is no evidence giving rise to a reasonable inference that Angotti knew anything about Hice's situation with Ms. Jahnke or his intent to seek an order of protection against her.

While this element is generally one for the trier of fact, at the summary judgment stage Hice must demonstrate that there is a genuine factual dispute about causation. His speculation or his subjective belief that he was fired because he intended to seek an order of protection is plainly insufficient. In McDermott v. Continental Airlines, Inc., 339 Fed. Appx. 552, 2009 U.S. App. LEXIS 16955 (6th Cir., July 30, 2009) (unpublished), the Sixth Circuit affirmed summary judgment in favor of an employer on plaintiff's public policy wrongful discharge claim after finding that the plaintiff had not shown a causal link between his complaints about safety violations and his termination. The airline asserted that plaintiff was fired because of his involvement with an accident at an airport, and his

failure to truthfully admit his involvement to his supervisor.  There was no dispute that a clear public policy existed in certain FAA and TSA regulations, and plaintiff had often complained about violations of those regulations.  With regard to a causal link, the court rejected his argument that his supervisor made derogatory comments to him after he appeared on a radio show complaining about an FAA violation.  The court found that the supervisor's comments were directed at the <u>manner</u> in which plaintiff communicated his safety complaints (going on a radio show), and not at the <u>content</u> of his complaint. Even if the comments were in response to the substance of his safety complaints, they were too isolated to give rise to a causal link, as there was no evidence that the supervisor's comments were related to plaintiff's termination.  Nor could the jury permissibly infer causation based upon the volume of plaintiff's safety complaints over the years; plaintiff's subjective belief that those complaints were the real reason he was terminated was simply insufficient.

The same is true here.  Hice's subjective belief that he must have been fired because Ms. Jahnke was Rath's sister-in-law, or because he informed DJJ that he intended to seek an order of protection against her, is insufficient to satisfy his prima facie burden of causation.  In view of this conclusion, the Court need not address the parties' arguments about DJJ's business justification due to the lack of evidence raising a genuine factual dispute about the causal link.

## CONCLUSION

For all of the foregoing reasons, Defendant's motion for summary judgment (Doc. 16) is granted.  Plaintiff's complaint is dismissed with prejudice.

-21-

SO ORDERED.

THIS CASE IS CLOSED.

DATED: April 25, 2016                    s/Sandra S. Beckwith
                                         Sandra S. Beckwith, Senior Judge
                                         United States District Court